DECISION AND JUDGMENT ENTRY
{¶ 1} This appeal comes to us from a judgment issued by the Toledo Municipal Court, which found state and local "vicious dog" laws to be constitutional. Because we conclude that the trial court erred as a matter of law, we reverse.
 {¶ 2} Appellant, Paul Tellings, who resided in the city of Toledo, Lucas County, Ohio, owned three pit bull type dogs. The dogs were family pets and had no history of aggressive or unlawful behavior. A health inspector, checking for lead paint, saw the dogs inside the Tellings residence and reported them to the Lucas County Dog Warden. Subsequently, one dog remained in the Tellings home, one was given away, and the third was confiscated and destroyed by the Dog Warden.
 {¶ 3} Appellant was charged by appellee, the city of Toledo, with two violations of Toledo Municipal Code § 505.14(a), limits on ownership to only one pit bull per household, and two violations of R.C. 955.22, failure to provide liability insurance. Appellant filed a motion challenging the constitutionality of R.C. 955.22, 955.11(A)(4)(a)(iii) which includes pit bulls in the definitions of "vicious dog," and the T.M.C. § 505.14(a). The court conducted a five day hearing on appellant's motion, scheduled as follows: July 17, 18, 22, 23, 2003, and November 20, 2003. During the hearing, many witnesses testified regarding the physical and behavioral characteristics of dogs, including pit bulls. The following experts and other witnesses testified on behalf of appellant:
 {¶ 4} 1) Dr. I. Lerh Brisbin, Ph.D. — Senior Research Scientist with the Savanna River Ecology Laboratory; University of South Carolina Professor: Expert in behavior, training, and handling of pit bull terriers and their anatomy;
 {¶ 5} 2) Dr. Mary Lee Nitschke, Ph.D. — Canine Behavior; Professor of Developmental Psychology, Statistics, Pet Behavior Psychology; Service Dog Trainer; Evaluator for Canine Good Citizenship and American Temperament Test Society;
 {¶ 6} 3) Dr. Laura Goldman, Ph.D. — Canine Behavior; Ph.D in Psychology; Pet and Service Dog Training;
 {¶ 7} 4) Glen Bui — B.S. in Genetic Engineering; Vice President of American Canine Foundation; Companion Animals Behavior Counselors Association member;
 {¶ 8} 5) Carl Herkstroeter — B.S. in Chemical Engineering; President/founder of and evaluator for American Temperament Test Society;
 {¶ 9} 6) Dr. Al Stinson, D.V.M. — Canine Behavior and Anatomy; retired Michigan State University professor; member of Michigan Department of Agriculture Dog Law Revision Committee;
 {¶ 10} 7) Dr. George Padgett, D.V.M. — Canine Geneticist and Pathologist; retired Michigan State University professor;
 {¶ 11} 8) Dr. Robert Esplin — D.V.M., local veterinary practice in Lucas County since 1970; Dog behavior counseling with clients;
 {¶ 12} 9) Tammy Price — Former Logan County Dog Warden and Humane Society Director; Licensed veterinary animal technician; dog training instructor; member of Ohio Dog Fighting Task Force; breeder, owner, exhibiter of American Staffordshire Terriers;
 {¶ 13} 10) Harry George — Exhibitor and judge for American Pit Bull shows; Ohio Representative for Endangered Breed Association; American Dog Breeders Association Judge and member; member of Ohio Dog Fighting Task Force; evaluator of pit bulls for Morrow County Dog Warden;
 {¶ 14} 11) Jed Mignano — Cruelty Investigator with Toledo Humane Society; Criminal Law degree; former employee with Fulton County Humane Society; and
 {¶ 15} 12) Cindy Cooke — Lawyer; dog breeder; United Kennel Club employee/representative.
 {¶ 16} The state presented the following witnesses:
 {¶ 17} 1) Karla Gardner Hamlin — Veterinary animal technician; 25 year employee at Lucas County Dog Pound; dog training; member of National Association of Dog Obedience Training, American Association of Pit Dog Trainers, International Association of Canine Professionals;
 {¶ 18} 2) Dr. Dale E. Wright — D.V.M., veterinary practice since 1959; former consultant for Lucas County Dog Warden; Ohio State Racing Commission employee; member of Ohio Dog Fighting Task Force
 {¶ 19} 3) Tom Skeldon — Lucas County Dog Warden; B.S. in Agriculture; former zoo director; guard and security dog trainer; military dog handler and trainer; member of Ohio Dog Fighting Task Force;
 {¶ 20} 4) Dr. Peter Borchelt, Ph.D. — Experimental Psychology in Animal Behavior; former professor Fordham University; private consultant for solutions to animal behavior problems; attending staff physician at The Animal Medical Center, New York City; Animal Behavior Society member.
 {¶ 21} The following relevant evidence was presented by many competent, well-respected experts regarding current, scientific information and data about pit bulls. In several instances, appellant's and appellee's experts agreed on similar facts regarding pit bulls, genetics, and behavior, but sometimes disagreed on the conclusions to be drawn from those facts.
 {¶ 22} Pit bulls originated in England around the late 1800's. Although initially used in "bull baiting," pit bulls were also brought to America and used as family protectors as settlers made their way across the western frontier. Once considered a sport, pit bulls were also used for dog fighting. During the early years of dog fighting, pit bulls were specifically selected for non-aggression against humans, since any attack against a person disqualified the pit bull. Thus, any human-aggressive pit bull was destroyed and any possibly linked genetic trait was not passed on. After dog fighting became illegal around the 1930's, the rules regarding breeding for aggression began to dissolve. Owners involved in today's illegal dog fighting may breed or inbreed animals irresponsibly, in a mistaken attempt to obtain more aggressive dogs. Dogs used in fighting may exhibit aggressive behavior when taken into custody by the dog warden, due partly to breeding and partly to training. Although most of the experts agreed that one could breed for aggressiveness, many testified that because genetic transmission of a behavior trait involved many complicated factors, such breeding attempts were inefficient. For example, just as a litter of ten greyhounds bred from two faster running parent dogs might produce only one faster running pup, a litter of pit bulls from two aggressive parent dogs was likely to produce only one offspring with a more aggressive temperament.
 {¶ 23} Evidence was presented that there are approximately 52 million dogs in the United States and that as many as 4.8 million are some form of pit bull. There are two breeds of registered pit bulls: American Staffordshire Terriers, registered with the American Kennel Club, and American Pit Bull Terriers, registered with the United Kennel Club and the American Dog Breeders Association. All three associations condemn dog fighting and will not register a breeder who is discovered to be involved in this activity. Pit bulls are trained for confirmation and participation in other dog trial events, such as weight pulling and agility. Despite the pit bull's reputation for body strength, in weight pulling competitions, many other breeds do as well or better.[1] A pit bull's musculature is no different than other strong, well muscled dogs, such as Saint Bernards, bull mastiffs, Rottweilers, and malamutes.
 {¶ 24} Many other pit bulls are simply unpedigreed family pets, and some are the unfortunate victims of abuse in dog fighting and other criminal activities. Much evidence was presented that pit bulls which have not been trained to be aggressive are highly obedient, eager-to-please, good family pets. Jed Mignano, a Toledo Humane Society cruelty investigator, testified that pit bulls had been taken in at the shelter, did not require special cages or treatment, and were adopted out without problems. He further stated that he had never been bitten by a pit bull and did not experience them to be "vicious" in comparison to other breeds. The state's expert, Dr. Borchelt, testified that he had never been bitten by a pit bull, that his investigations for housing complaints against pit bulls in New York did not reveal any vicious pit bulls, and that most pit bulls brought to animal shelters were adopted out without hesitation. Karla Hamlin testified that some pit bulls taken into the Lucas County Dog Pound exhibited aggressive behavior, chewing on mesh fencing and through aluminum water buckets. She acknowledged, however, that she had never been bitten by a pit bull and did not think pit bulls, as a breed, were any more likely to bite or to fight than other dogs.
 {¶ 25} Dr. Brisbin, as well as the other experts, testified that pit bulls do not have locking jaws. Based on actual dog dissections and measurement of their skulls, the evidence demonstrated that pit bull jaw muscles and bone structure are the same as other similarly sized dogs. No evidence was presented to demonstrate that a pit bull's bite is any stronger than other dogs of its size and build. He stated that, contrary to information relied upon and perpetuated by earlier case law[2] and law review articles,[3] assertions that a pit bull can bite with a "force of 2,000 pounds per square inch" have absolutely no basis in fact or scientific proof. The testing of dog bite strength has never been done, and would be difficult if not impossible to perform.[4]
 {¶ 26} What is notable is that, like many border collies which have an innate ability to "herd," some pit bulls have the innate ability to "bite and hold." Again, however, this behavior, if demonstrated, can be modified or directed to either appropriate uses, such as gently holding wild pigs for tagging in a research project, or for inappropriate uses, such as dog fighting.[5] Again, not all pit bulls exhibit this behavior, however, just as all border collies do not want to herd and all retrievers do not show a desire to retrieve game or objects.
 {¶ 27} Many pit bulls may also exhibit a behavior or trait referred to as "gameness," which, simply stated, is the ability or willingness to continue doing an action once begun, i.e. "stick-to-it-iveness." Gameness, in itself, is not a negative trait. For example, the ability to carry out duties or trained tasks, despite injury, distraction, or frustration, is desirable in pit bulls which have been trained to be search and rescue dogs, protection dogs in the U.S. military, drug sniffing dogs, and therapy dogs.[6] In the context of dog fighting, gameness would be the ability to continue to fight, even while injured or losing the fight. Although considered positive by the owner-fighters, gameness in this context is considered undesirable to animal cruelty investigators, law enforcement, and dog wardens. Some controversy surrounds whether gameness is purely genetic or is simply a predisposition which can be enhanced by environmental factors — the "nature versus nurture" debate. The experts agreed, however, that, just as some greyhounds exhibit more willingness to chase the "rabbit" than others, some pit bulls have more "gameness" than others.
 {¶ 28} Although some statistics were presented in a Center for Disease Control report, which listed different dog breeds involved with human fatalities for the entire United States, these statistics were from 1979 to 1996. Most experts acknowledged that these were simply bare statistics, without reference to the total numbers of dogs in each breed population. During the hearings, the trial court acknowledged that, since these numbers were simply bare statistics, without reference to the total number of dogs in each breed, the statistics had no real relevance or meaning.
 {¶ 29} Recent statistics from reports supplied by 44 Ohio county health departments indicated very few bites by pit bulls in 2001-2002, with chows, German shepherds, Rottweilers, and Labrador retrievers at higher overall percentages of bites than pit bulls. No recent statistics on fatal human attacks in the United States were presented and no evidence was presented of any fatalities involving pit bulls in Lucas County. In addition, testimony was presented that the situations and reasons for any dog attacks, information which was not included in the CDC report, were much more important to the purpose of preventing future injuries than bare numbers. One expert testified that most fatal attacks on children could be attributed to lack of parental supervision, rather than inherently vicious dogs.
 {¶ 30} Dog Warden Skeldon acknowledged that even if a dog was 50 per cent pit bull, if it did not "look like a pit bull," the owner would not be charged. On the other hand, if a dog did look like a pit bull," it would be classified as a pit bull and the owner would be subject to the "vicious dog" laws. No definitive description of a "pit bull" was presented. The warden also acknowledged that there is really no way to tell if a dog is or is not a "pit bull" and the determination is made by his or a deputy's subjective judgment. Regardless of its parentage or behavior, however, if a dog is labeled a pit bull, the owner would be charged under the statutes and city ordinance.
 {¶ 31} Although Dr. Wright testified he believed that pit bulls have some sort of "trigger mechanism" which makes their behavior unpredictable and they give off no warning "signals," he acknowledged that he had done no studies, and had no scientific data, proof, or other evidence in support of his theory. The other experts dismissed this theory and agreed that all dogs give off signals which may be ignored or unrecognized by people. They also stated that, although pit bulls may have some genetic predisposition for certain behaviors, these behaviors can be easily modified or controlled with training and environmental socialization.
 {¶ 32} The trial court overruled appellant's motion to declare the statutes and municipal code section to be unconstitutional. The court determined that there was "little, if any, evidence presented that would indicate that" pit bulls, as a breed, are dangerous "when trained and adapted in a social situation." The court found that no statistical evidence indicates pit bulls bite more often than some other breeds, but that the pit bull's bites "cause a disproportionate number of fatalities amongst dog breeds." Further, the court also found that the pit bull has been used extensively for dog fighting and by "criminal elements of the population, such as drug dealers, dog fighters, and urban gang members." The court then found that pit bulls create a "substantial and real threat to the safety of the public" because the dogs are found in urban settings with crowded living conditions and a large number of children.
 {¶ 33} After considering the evidence, the court found that pit bulls are not, as a breed, more dangerous than other breeds. The court concluded, however, that the state statutes and municipal ordinance were constitutional since the pit bull still presented a problem in the urban setting. The court noted, however, that responsible owners would be permitted to present evidence that their pit bulls are not vicious, since the Ohio Revised Code only "codifies a Pit Bull as a `prima facie' vicious dog." After overruling his motion, the court ultimately found appellant guilty on all counts.
 {¶ 34} Appellant now appeals from that judgment, arguing the following four assignments of error:
 {¶ 35} "Assignment of Error No. 1
 {¶ 36} "The trial court erred when it held that Toledo Municipal Code § 505.14 and Ohio Revised Code § 955.11 and §955.22 were constitutional because the statutes violate the defendant's rights to procedural due process.
 {¶ 37} "Assignment of Error No. 2
 {¶ 38} "The trial court erred when it held that Toledo Municipal Code § 505.14 and Ohio Revised Code § 955.11 and §955.22 were constitutional because the statutes violate the defendant's rights to equal protection and substantive due process because there is no rational basis to single out the American Pit Bull terrier as inherently dangerous.
 {¶ 39} "Assignment of Error No. 3.
 {¶ 40} "The trial court erred when it held that Toledo Municipal Code § 505.14 and Ohio Revised Code § 955.11 and §955.22 were constitutional because the statutes permit an improper taking of private property without compensation.
 {¶ 41} "Assignment of Error No. 4
 {¶ 42} "The trial court erred when it held that Toledo Municipal Code § 505.14 and Ohio Revised Code § 955.11 and §955.22 were constitutional because the statutes violate the defendant's rights to due process because there is no rational basis to positively identify a pit bull."
 I. {¶ 43} In his first assignment of error, appellant asserts that R.C. 955.11 and 955.22 and Toledo Municipal Code § 505.14
are unconstitutional because they violate procedural due process. We agree.
 {¶ 44} R.C. 955.22 states that, "No owner, keeper, or harborer of a vicious dog shall fail to obtain liability insurance with an insurer authorized to write liability insurance in this state providing coverage in each occurrence, subject to a limit, exclusive of interest and costs of not less than one hundred thousand dollars because of damage or bodily injury to or death of a person caused by the vicious dog."
 {¶ 45} Toledo Municipal Code § 505.14(a) provides that, "No person * * * shall own, keep, harbor or provide sustenance for more than one vicious dog, as defined by Ohio Revised Code §955.11, or dog commonly known as a pit bull or pit bull mixed breed dog, regardless of age, in the City of Toledo."
 {¶ 46} On September 22, 2004, just two months after the trial court's decision in this case was issued, the Supreme Court of Ohio struck down R.C. 955.22 as unconstitutional, holding that the statute "violates procedural due process insofar as it fails to provide dog owners a meaningful opportunity to be heard on the issue of whether a dog is `vicious' or `dangerous' as defined in R.C. 955.11(A)(1)(a) and (A)(4)(a)." State v. Cowen,103 Ohio St.3d 144, 2004-Ohio-4777, syllabus. In Cowen, the dogs involved were alleged to have attacked a neighbor while roaming the neighborhood. Id. at ¶ 2. The warden determined that the dogs were vicious and told Cowen she must comply with the "vicious-dog" law requirements. Id. When she failed to comply with certain requirements, she was found guilty of several violations under R.C. 955.22. Id. at ¶ 4.
 {¶ 47} In finding that R.C. 955.22 was unconstitutional, theCowen court reasoned that an owner had no initial opportunity to dispute a dog warden's designation of a particular dog as "vicious" or "dangerous" as defined by R.C. 955.11(A)(1) and (A)(4)(a). Id. at ¶ 13. Since these designations carried specific additional statutory requirements under the law, the owner's only way to challenge the initial "vicious" dog designation was to break the law by non-compliance with the statute. Id. The Cowen
court did not exclude any of the definitions, but referenced R.C.955.11 (A)(4)(a) in its entirety. Id. at the syllabus. Cowen,
supra, at the syllabus. The Cowen court's reasoning was based upon the defendant's inability to challenge the initial finding, not upon which definition was applied. Id.
 {¶ 48} In the present case, when appellant's dogs were classified as "vicious," he also had no opportunity to challenge that finding before being charged with non-compliance with R.C.955.22. The trial court's interpretation of the "prima facie evidence" statutory language was incorrect, since, as Cowen
illustrates, appellant did not, in fact, have an opportunity under the statute to offer evidence that his pit bulls were not vicious in order to refute the charges. Rather, like the definitions applied in Cowen, the R.C.955.11(A)(4)(a)(iii)[7] definition is treated as an unrebuttable presumption, that if the dog warden designates the dog as a pit bull, it is "vicious," regardless of its training, behavior, or history. Consequently, we conclude that, pursuant toCowen, R.C. 955.22 is unconstitutional as applied to the present case.
 {¶ 49} Likewise, we conclude that T.M.C. § 505.14(a), which is based upon the definitions provided in R.C. 955.11(A)(4)(a), violates the constitutional right to procedural due process. As with R.C. 955.22, the ordinance also depends upon the dog warden's initial determination that a dog is "vicious" because it is a pit bull or looks like a pit bull, and does not provide any procedure to challenge this finding prior to being penalized or charged with non-compliance with the "vicious dog" laws. As inCowen, appellant was not provided with an opportunity to either dispute that his dogs were pit bulls or that they were "vicious." Therefore, under the rationale and holding of Cowen, supra, we conclude that the trial court erred in failing to find that R.C.955.22 and T.M.C § 505.14(a) are unconstitutional.
 {¶ 50} Accordingly, appellant's first assignment of error is well-taken.
 II. {¶ 51} In his second assignment of error, appellant argues that the trial court erred in failing to find that R.C. 955.11
and 955.22 and T.M.C. § 505.14(a) are unconstitutional because the statutes violate appellant's rights to equal protection and substantive due process since "there is no rational basis to single out the American Pit Bull terrier as inherently dangerous."
 {¶ 52} The constitutional rights which prohibit a state from depriving a person of "life, liberty, or property, without due process of law" are derived from both the federal and Ohio constitutions. See Fourteenth Amendment, U.S. Const. and Section1, Article I of the Ohio Constitution. Thus, in a criminal case, substantive due process requires that before one can be deprived of property, the conduct underlying a finding of guilt must actually be a crime. State v. Phillips, 11th Dist. No. 2004-T-0006, 2005-Ohio-6573 at ¶ 8. Where a statute under review does not affect a fundamental right, the appropriate level of scrutiny is the "rational basis" test. Clements v. Fashing
(1982), 457 U.S. 957, 963; Fabrey v. McDonald Village PoliceDept. (1994), 70 Ohio St.3d 351, 354. Under the rational basis test, laws enacted by the Ohio General Assembly are valid "if they bear a real and substantial relation to the object sought to be obtained, namely the health, safety, morals or general welfare of the public, and are not arbitrary, discriminatory, capricious or unreasonable. * * * The federal test is similar. To determine whether such statutes are constitutional under federal scrutiny, we must decide if there is a rational relationship between the statute and its purpose." State v. Thompkins (1996),75 Ohio St.3d 558.
 {¶ 53} A municipality may also exercise its legislative powers for the general welfare of its citizens. Desenco, Inc. v.Akron (1999), 84 Ohio St.3d 535, 545. Also viewed under the rational-basis test, a municipal enactment comports with due process "`if it bears a real and substantial relation to the public health, safety, morals or general welfare of the public and if it is not unreasonable or arbitrary.'" Id., quotingBenjamin v. Columbus (1957), 167 Ohio St. 103, 110.
 {¶ 54} Legislation enjoys a strong presumption of constitutionality, which remains unless the challenging party establishes beyond a reasonable doubt that the legislation is unconstitutional. State v. Thompson (2001), 92 Ohio St.3d 584,586; State v. Williams (2000), 88 Ohio St.3d 513, 521. Nevertheless, in exercising the power of judicial review, no amount of deference to a legislative enactment should force a court to concede that something is that which it is not. SeeMarathon Oil Co. v. Bd. of Zoning Adjustment (1975),44 Ohio App.2d 402 (finding that a municipal ordinance declaring abandoned service stations a public nuisance was arbitrary and unconstitutional).
 {¶ 55} Citizens enjoy the property right to own dogs, and the Supreme Court of Ohio has recognized the special relationship that often exists between owners and dogs. State v. Anderson
(1991), 57 Ohio St.3d 168, 170. "To many, a pet dog is as important and as loved as the human members of the family." Id. Thus, most dog owners consider their pet to be more than a mere thing, and the ownership of it constitutes a valuable right. Id. Regardless, however, of this possible, strong sentimental attachment, dog ownership is not a fundamental right. Id. Consequently, when reviewing statutes which regulate dogs and ownership, we must apply the rational-basis test to any due process or equal protection claims. See State v. Cowan, supra;State v. Anderson, supra.
 {¶ 56} The object and purpose of all vicious dog laws, including the Ohio statutes and Toledo Municipal Code, is obviously protection — to prevent injuries to persons and property by dogs. R.C. 955.11(A)(4)(a) provides that:
 {¶ 57} "4(a) "Vicious dog" means a dog that, without provocation and subject to division (A)(4)(b) of this section, meets any of the following:
 {¶ 58} "(i) Has killed or caused injury to a person;
 {¶ 59} "(ii) Has caused injury, other than killing or serious injury, to any person, or has killed another dog;
 {¶ 60} "(iii) Belongs to a breed that is commonly known as a pit bull dog. The ownership, keeping or harboring of such a breed of dog shall be prima-facie evidence of the ownership, keeping, or harboring or a vicious dog."
 {¶ 61} The first two subsections of R.C. 955.11(A)(4) require a dog to have caused some injury to persons or another dog in order to be classified as "vicious." Under R.C.955.11(A)(4)(a)(iii), however, a dog may be deemed to be "vicious" solely if the dog belongs to the breed commonly known as a pit bull, even if the dog has not, without provocation, killed or caused injury to any person, or killed another dog.State v. Ferguson (1991), 76 Ohio App.3d 747, 751. R.C.955.11(A)(4)(a)(iii) purports to allow a defendant dog owner to rebut the state's prima facie showing that his dog is "vicious" even if he admits that the dog in question belongs to the breed commonly known as a pit bull dog. Id. In actual practice, however, where the dog is admitted to be a pit bull, the absence of the elements contained in R.C. 955.11(A)(4)(a)(i) and955.11(A)(4)(a)(ii) standing alone, "is insufficient as a matter of law to rebut the state's prima facie showing that the dog is a `vicious dog' as defined by R.C. 955.11(A)(4)(a)(iii)." Id. See, also, State v. Browning (Dec. 16, 2002), 5th Dist. Nos. 2002CA42, 2002CA43, 2002CA44, 2002CA45, 2002-Ohio-6978 (testimony that pit bull dogs which had done no injury or vicious acts, were not aggressive, were well-behaved, peaceful family pets, and had never attacked anyone, was insufficient evidence to rebut the "prima facie" evidence that the dogs were "vicious.") Breed-specific laws were enacted because, in the past, courts and legislatures considered it to be a "well-known fact" that pit bulls are "unpredictable," "vicious" creatures owned only by "drug dealers, dog fighters, gang members," or other undesirable members of society. See State v. Anderson (1991),57 Ohio St.3d 168.
 {¶ 62} Over time, however, "well-known facts" are often discarded in light of new technological, scientific, or social discoveries and the laws change in response to this new information. For example, in 1981, the Supreme Court of Ohio held that expert testimony was inadmissible regarding "battered woman syndrome" because it was not yet generally accepted as a legitimate mental condition affecting certain women. See Statev. Thomas (1981), 66 Ohio St.2d 518, syllabus. Just nine years later, however, the Supreme Court of Ohio overruled Thomas,
holding that "battered woman syndrome has general substantial scientific acceptance to warrant admissibility into evidence."State v. Koss (1990), 49 Ohio St.3d 213, syllabus. Another change instigated by the discovery and application of new scientific information is the 2003 Ohio legislative enactment which allows previously convicted persons to submit DNA testing of old evidence in postconviction proceedings. See R.C. 2953.71
et seq. As scientific information advances and becomes available, courts have a duty to reconsider issues and make decisions which are supported by the actual evidence presented, instead of relying on "common knowledge" and opinion generated by newspaper sensationalism and hearsay, rather than accurate, scientific evidence.
 {¶ 63} As the evidence presented in this case demonstrates, previous cases involving "vicious dog" laws, especially from the late 1980's and early 1990's, relied on what is now outdated information which perpetuated a stereotypical image of pit bulls. See State v. Anderson, 57 Ohio St.3d 168, citing to Singer v.Cincinnati (1990), 57 Ohio App.3d 1; State v. Robinson (1989),44 Ohio App.3d 128; Hearn v. Overland Park (1989),244 Kan. 638, 772 P.2d 758; American Dog Owners Assn., Inc. v. Dade Cty.
(S.D.Fla. 1989), 728 F.Supp. 1533, 1537; and State v. Peters
(Fla.App. 1988), 534 So.2d 760. These cases, due in part to unavailable, scientifically based evidence or expert testimony about the breed, branded all pit bulls as "vicious" on the basis of what was known or believed at that time.
 {¶ 64} In this case, the trial court was called upon to sort through a virtual encyclopedia of information, testimony and evidence, to discern truth from fiction, and to consider opinions and conclusions drawn by respected experts by both parties. Extensive, competent and credible evidence was presented by these experts which showed many of the beliefs and "myths" about pit bulls to be simply untrue and unsupported by now accepted scientific, genetic, medical, or canine behavior principles. When discussing pit bull characteristics, much of the testimony by appellee's four witnesses related to pit bulls which have been trained to fight and be aggressive. Appellant's experts and witnesses, on the other hand, testified generally about the breed as a whole. They emphasized that the greater population of pit bulls in the United States are not used for pit fighting, but are well-trained, obedient dogs used in competitions and as family pets. The trial court noted that all the animal behaviorists from both parties testified that a pit bull, trained and properly socialized like other dogs, would not exhibit any more dangerous characteristics than any other breed of dog. After considering all the evidence before it, the trial court agreed, finding that pit bulls, as a breed, are not more dangerous than other breeds.
 {¶ 65} Instead of applying the rational-basis test to this finding, however, the trial court expressed its concerns with problems in a crowded, urban setting with pit bulls who are trained and bred to be aggressive. The trial court also relied on and quoted a 1988 University of Dayton Law Review article[8] which was based on old statistics and the presumption that pit bulls, as a breed, are dangerous, vicious animals. In addition, after agreeing that bare statistics presented in the case were not relevant, the court incorporated the law review article's reference to a "disproportionate number of pit bulls" being allegedly involved in serious attacks. Our review of the record reveals no current statistics since 1996 were presented to support the notion that pit bulls have continued to be involved in a "disproportionate number" of attacks or fatalities. In our view, despite its own factual finding to the contrary, the trial court improperly relied on an outdated, irrelevant, and inadmissible source of factual information to revive the "vicious" pit bull sentiment and justify the finding that the statutes and ordinance are constitutional.
 {¶ 66} We agree that the protection of property and people from injuries by dogs is clearly a legitimate governmental interest. Nevertheless, this interest must bear a rational or "real and substantial relationship" to the conduct being regulated by the statute, in this case the mere ownership of pit bulls. The state statutes and city ordinance were all enacted specifically to regulate pit bulls because of their allegedly inherently "dangerous" temperament. Since the trial court found that the pit bull, as a breed, is not inherently dangerous or vicious, then the interest in protecting the health and welfare of citizens is no more rationally related to pit bulls than it is to any other breed which has a potential to inflict injury on humans. What remains is a regulation and limitation on a specific breed for reasons unrelated to that breed, but rather related to human misconduct or negligence in ownership of the breed. The ownership and control of dogs in a crowded, urban setting is a legitimate concern which relates to all dogs. Once the finding is made that a specific breed does not inherently represent a greater danger than any other breed, a law that regulates that breed on the basis of mere ownership is arbitrary, unreasonable, and discriminatory. Even presuming a legitimate concern that pit bulls are used in dog fighting or by other criminals, evidence was presented that the breed-specific laws have had virtually no effect in abating or preventing dog fighting or other crimes. Therefore, since the trial court found that pit bulls as a breed are not inherently dangerous, we conclude that R.C.955.11(A)(4)(a)(iii) is unconstitutional, since it has no real and substantial relationship to a legitimate state interest.
 {¶ 67} T.M.C. § 505.14(a), which permits ownership of only one pit bull by Toledo residents, is based directly on the R.C.955.11(A)(4)(a)(iii) definition that pit bulls are "vicious." In other words, the city ordinance sought to prevent a person from owning more than one "vicious" dog, under the theory that a "pack" of vicious dogs creates higher risk of danger to citizens. The ordinance does not require misconduct or injury by the dog, only the mere ownership of more than one pit bull. Since we conclude that there is no evidence that pit bulls are inherently dangerous or vicious, then the city ordinance limitation on ownership is also arbitrary, unreasonable and discriminatory. If a citizen may own more than one non-vicious dog of a particular breed, then ownership of more than one non-vicious pit bull has no rational, real or substantial relationship to a legitimate governmental interest. Therefore, we conclude that T.M.C. §505.14 is also unconstitutional.
 {¶ 68} In striking down the breed-specific statutes and ordinance, we would emphasize that this does not mean that dog owners are free to ignore their duties to protect others from their dogs, vicious or otherwise. Dogs which are dangerous, aggressive animals, regardless of breed, may create problems in the crowded, urban setting. Based on the trial court's findings, however, these problems are attributable to the actions of the owners, not because pit bulls are inherently dangerous. Even without the automatic "vicious" designation of pit bulls, owners must be held responsible for actual wrongful conduct of the dog or owner, i.e., an owner who inappropriately encourages or trains a dog to be aggressive, has used dogs illegally for dog fighting or other crimes, or has permitted a dog to behave in an unlawful, threatening, dangerous, or vicious manner.
 {¶ 69} Therefore, we conclude that both R.C. 955.22,955.11(A)(4)(a)(iii) and T.M.C. § 505.14(a), which relied on the now disproved presumption that pit bulls, as a breed, are inherently dangerous, are unconstitutional since they lack a rational or real and substantial relationship to a legitimate governmental interest.
 {¶ 70} Accordingly, appellant's second assignment of error is well-taken.
 III. {¶ 71} In his fourth assignment of error, appellant argues that the trial court erred in finding that R.C. 955.11 and 955.22
and Toledo Municipal Code § 505.14(a) were constitutional because the "statutes violate the defendant's rights to due process because there is no rational basis to positively identify a pit bull." What appellant essentially asserts is that the statute is unconstitutional because it is too vague when practically applied to identification of pit bulls.
 {¶ 72} The void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory arrests. Kolender v. Lawson (1983),461 U.S. 352, 357. In order to prove such an assertion, the challenging party must show that the statute is vague "not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all. * * *" Coates v.Cincinnati (1971), 402 U.S. 611, 614. In other words, the challenger must show that upon examining the statute, an individual of ordinary intelligence would not understand what he is required to do under the law. Id.
 {¶ 73} We note initially, that in light of our disposition of appellant's first and second assignments of error, his fourth assignment of error is technically moot. The facts of this case, however, compel us to address this assignment. We are troubled by the lack of an exact statutory definition of "pit bull," the evidence presented that more than ten non-pit bull breeds look very much like pit bulls, and the highly subjective nature of the identification process. Particularly troublesome is the fact that, depending on the zealousness and bias of the local agency, criminal charges have likely been brought based on purely individual and speculative decisions on whether the jaw of a dog is "massive" enough or the chest is muscular enough or the brow is broad enough to be designated as a "pit bull," rather than some other similar breed, such as a bull dog, boxer-mix, or bull mastiff. Although the Anderson court indicated that persons could easily discern that they owned a pit bull, we respectfully suggest that, some fifteen to twenty years later, with the greater number of a variety of breeds and mixed breeds, this no longer holds true.[9]
 {¶ 74} Moreover, contrary to the trial court's statutory interpretation in this case, it is unlikely that the owner of a pit bull could ever overcome the state's "prima facie" evidence, since, he or she would be required to "prove a negative." Without documentation to prove the dog's breed origins, a non-pit bull owner could easily be ensnared under the statute, even though unaware that his or her dog could "fit the description" of his local dog warden agency. Dog Warden Skeldon addressed the difficulties in identifying pit bulls and acknowledged that some persons who obtained what they thought were pit bulls as pups, later discovered the dogs were not pit bulls. On the other hand, we suggest that a puppy which does not look much like a pit bull, may exhibit more "pit bull characteristics" after it has become full-grown and a part of the family. Thus, if an owner did not think his dog looked like a pit bull, he or she might believe they could not be charged under the law.
 {¶ 75} In addition, some owners may have believed as the trial court did, that as long as their pit bulls were not aggressive or had not caused any problems, the "vicious" designation could be refuted and the owner would not be subject to the additional requirements or penalties. As noted previously, however, once a dog has been designated as a pit bull, even evidence that a dog has an unblemished bite history and good, non-aggressive, obedient behavior is still insufficient to prove that it is not a "vicious" dog. See State v. Browning, supra;State v. Ferguson, supra.
 {¶ 76} Based upon the facts presented, we conclude that the subjective identification of pit bulls may often include both non-pit bulls or dogs which are not vicious, to the extent that an ordinary citizen would not understand that he was breaking the law and which would result in the occurrence of arbitrary arrests and criminal charges. Therefore, since both R.C.955.11(A)(4)(a)(iii) and T.M.C. § 505.14(a) are based upon that identification process, we conclude that they are unconstitutionally vague.
 {¶ 77} Appellant's fourth assignment of error is well-taken; appellant's third assignment of error is deemed moot.
 {¶ 78} The judgment of the Toledo Municipal Court is reversed and appellant's convictions are vacated. Appellee is ordered to pay the costs of this appeal pursuant to App.R. 24. Judgment for the clerk's expense incurred in preparation of the record, fees allowed by law, and the fee for filing the appeal is awarded to Lucas County.
Judgment Reversed.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4, amended 1/1/98.
Singer, P.J. Skow, J. concur.
Dennis M. Parish, J., dissents.
[1] An American bull dog has the record for most weight pulled — 1,000 pounds. The record for weight pulling, pound-for-pound of body weight, is held by a toy poodle that pulled 288 pounds in a harness.
[2] See State. v. Anderson (1991), 57 Ohio St.3d 168, 172.
[3] See "Banning the Pit Bull: Why Breed-Specific Legislation is Constitutional," (1988) 13 U. Dayton L. Rev. 279.
[4] Dr. Brisbin testified that to measure bite strength, a dog would have to bite on a steel plate connected to a machine which would then register the pressure exerted. This type of test was conducted with alligators, but the inherent problem was knowing whether the animal was exerting full force, or, as the trial court stated, was just being "a slacker." Likewise, if one could somehow get a dog to actually bite on a metal plate, then the issue would become whether or not the dog was biting with full force or would bite harder on something more appealing, like meat or a bone.
[5] Dr. Brisbin stated that he used pit bulls specifically to retrieve wild pigs in his research projects, because, unlike retrievers who might have more difficulty "giving up" the prey, pit bulls were readily trained to gently hold the pigs by the hind leg, causing no injury, and then easily to let go once the pig had been tagged.
[6] According to testimony presented, one famous pit bull, "Sergeant Stubby," served in the military on the front lines during World War I, protecting soldiers and catching German spies. Sergeant Stubbies was decorated by two presidents and is preserved in the Smithsonian Institute.
[7] R.C. 955.11(A)(4)(a)(iii) provides that "vicious dog" includes any dog which "[b]elongs to a breed that is commonly know as a pit bull. * * *."
[8] "Banning the Pit Bull: Why Breed-Specific Legislation is Constitutional," (1988) 13 U. Dayton L. Rev. 279.
[9] Based on the information available in that case and at the time, State v. Anderson, supra stated: "Whether a particular dog constitutes a pit bull is a matter of evidence, to be determined at trial. Vanater v. South Point, supra, at 1244;State v. Robinson, supra; Lima v. McFadden (June 30, 1986), Allen App. No. 1-85-22, 1986 WL 7474 unreported. If a dogpossesses none of the aforementioned physical or behavioraltraits such that the owner had no actual or constructive noticethat it was a dog commonly known as a pit bull, then the ownershould have no difficulty establishing at trial that he or shedoes not in fact own a dog commonly known as a pit bull. Pitbulls possess the physical and behavioral traits as discussed inthis opinion. A dog lacking in these features is not a dog"commonly known as a pit bull dog" and its owner cannot beconvicted under the statute." (Emphasis in the original.) Under the current status of the law, persons prosecuted for allegedly owning pit bulls based solely upon a dog warden's subjective designation will have little success in establishing that a "look-alike" dog of unknown origin is not, in fact, a pit bull.